## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MOLLY HAYES, et al.,** | |
| Plaintiffs, | |
| | Case No. 19-cv-03596 |
| v. | |
| | Judge Mary M. Rowland |
| **SANDEEP NARANG, M.D., et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Molly Hayes and Daniel Namie, individually and as parents and next friends of M.N. and A.N., bring suit against Defendants Sandeep Narang, M.D., Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie"), and Yhana Lewis challenging their custodial separation under 42 U.S.C. § 1983. Plaintiffs also bring claims of malicious prosecution under state law. Before the Court are Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendant Lewis' motion to dismiss [38] is granted in part and denied in part. Defendants Narang and Lurie's motion to dismiss [43] is granted.

## BACKGROUND

The following facts are taken from Plaintiffs' First Amended Complaint ("FAC") and are accepted as true for purposes of the present motions. Plaintiffs Dr. Molly Hayes and Daniel Namie are the parents of M.N. and A.N. (Dkt. 37 at ¶ 10).

## A.N.'s Hospitalization

On September 22, 2017, at approximately two months of age, A.N. was admitted to Lurie Hospital with breathing difficulties and a history of cardiac arrest. (*Id.* at ¶ 11). Between September 24, 2017 and October 2, 2017, A.N. received various medical treatments including extracorporeal membrane oxygenation ("ECMO") and Lasix. (*Id.* at ¶ 12). An x-ray taken of A.N. on October 6, 2017, did not show any fractured bones. (*Id.* at ¶ 13). At some point between October 11, 2017 and October 13, 2017, while A.N. was still at Lurie, Hayes observed a hospital employee roughly handling A.N. (*Id.* at ¶15). Hayes reported the incident to A.N.'s nursing staff and doctors. (*Id.*) On October 20, 2017, A.N. was discharged home with strict instructions for care, including regularly measuring his oxygen levels. (*Id.* at ¶ 17).

On the morning of October 26, 2017, A.N.'s oxygen levels dropped and Namie called 911. (*Id.* at ¶ 19). A.N. was taken by ambulance to Delnor Hospital. (*Id.*) At Delnor, A.N. received an x-ray revealing that he had bi-lateral clavicle fractures and fractures of the fourth and fifth ribs. (*Id.* at ¶21). A.N.'s doctor at Delnor, Dr. Kalsi confirmed the finding of fractures, but did not observe any bruising or other signs of injury. (*Id.* ¶ 22). Dr. Kalsi conveyed these findings to Hayes and Namie, who indicated they did not know how the fractures may have occurred and denied that A.N. had any sort of accident. (*Id.* at ¶ 23).

## Child Abuse Investigation

As is the practice when children have unexplained fractures, Dr. Kalsi reported A.N.'s fractures to Illinois Department of Children and Family Services ("DCFS") officer, Yhana Lewis, but told her that he could not opine as to the cause of A.N"s

injuries. (*Id.* at ¶ 24). Without further investigation, Lewis immediately reported Hayes and Namie for suspected child abuse to Detective Sarah Sullivan of the Geneva Police Department. (*Id.* at ¶¶ 26-27). Plaintiffs allege that Lewis misrepresented her discussion with Dr. Kalsi, telling Detective Sullivan that medical staff believed A.N.'s injuries were indicative of abuse. (*Id.* at ¶ 27). Lewis called Detective Sullivan later that day and once again misrepresented the facts by informing Detective Sullivan that an unnamed child abuse specialist also believed A.N.'s injuries were indicative of child abuse. (*Id.* at ¶ 28).

A.N. was transferred back to Lurie the afternoon of October 26, 2017, where he was placed under the care of Dr. Sandeep Narang, the head of the Lurie's Division of Child Abuse Pediatrics. (*Id.* at ¶¶ 30-31). Upon examination of A.N., Dr. Narang concluded that his fractures were acute and likely 0-10 days old. (*Id.* at ¶ 33). Because A.N. had most recently been in the care of his parents, Dr. Narang determined that the injuries were consistent with abuse by Hayes and Namie and conveyed this information to Lewis. (*Id.*) Plaintiffs allege that Dr. Narang ignored A.N.'s prior and existing medical condition and intentionally aged the fractures as 0-10 days old, instead of 10-14 days, to make it appear that the fractures occurred while in the care of Hayes and Namie rather than at Lurie. (*Id.* at ¶¶ 35-38). Despite learning from Hayes and Namie that A.N. may have been roughly handled by Lurie staff during his initial stay, Dr. Narang failed to convey this information to Lewis. (*Id.* at ¶¶ 36; 40).

Lewis sent Elisa Corona, a DCFS investigator, to Lurie to investigate A.N.'s injuries. (*Id.* at ¶ 41). Plaintiffs allege Lewis' intention at the time was to remove A.N.

and his sister, M.N., from their parents' custody "[r]elying primarily on Dr. Narang's" conclusion. (*Id.*) Corona explored A.N.'s condition and learned that M.N. was a normal and healthy child who exhibited no signs of abuse. (*Id.* at ¶ 42). Corona raised concerns to Lewis regarding removing the children from their parents' custody without further investigation and proposed a safety plan that would allow the children to remain with their parents. (*Id.* at ¶ 43). Lewis rejected this suggestion, accusing Corona of "taking it easy on 'white' parents,'" and ordered Corona to remove the children from their parents. (*Id.*)

Corona informed Hayes and Namie that DCFS planned to take custody of their children. (*Id.* at ¶ 44). Corona stated that while she recommended a different approach, Lewis accused her of taking it easy on white parents. (*Id.*) Corona conveyed that A.N. would be admitted to Lurie, and that if they did not agree to a safety plan, M.N. would be placed in foster care. (*Id.* at ¶ 44). To prevent M.N.'s placement in foster care, Hayes and Namie agreed to a safety plan that required them to move out of the family home and allow family members to live in the home and care for A.N. and M.N. (*Id.* at ¶ 45). Hayes and Namie were not allowed unsupervised contact with their children. (*Id.*)

## Additional Testing

On October 27, 2017, Dr. Narang reported to Lewis that additional testing revealed that A.N. had two broken clavicles, as many as seven broken ribs, a broken right shin and tibia, a healing fracture on the right femur, a broken left radius, and a broken right tibia. (*Id.* at ¶ 46). Dr. Narang once again misrepresented the time of

origin of the fractures, reporting that all the fractures aside from the femur were acute and 0-10 days old. (*Id.* at ¶ 47).

On October 31, 2017, A.N. was seen at Lurie by Dr. Keshwani Mahima, who was consulted to assess whether A.N. had a metabolic bone disease, such as Rickets. (*Id.* at ¶¶ 48-49). Dr. Mahima concluded that while she did not find any sign of Rickets, A.N.'s "bones appear thin throughout." (*Id.*) She recommended additional testing. (*Id.* at ¶ 49). Despite this conclusion, Dr. Narang failed to have a pediatric orthopedic specialist evaluate A.N. and never ruled out metabolic bone disease as a cause of A.N.'s fractures. (*Id.* at ¶ 51). Dr. Narang compiled the conclusions from his evaluations of A.N. into a report dated November 1, 2017, which he knew would be used by DCFS in custody proceedings against Hayes and Namie. (*Id.* at ¶¶ 57-58). His ultimate conclusion was that "abuse could not be ruled out and evaluation was ongoing." (*Id.* at ¶ 60).

## **Temporary Custody Hearing**

On November 3, 2017, relying on the opinion of Dr. Narang, Lewis pressed the Kane County State's Attorney to institute legal action against Hayes and Namie to terminate their parental rights over A.N. and M.N. (*Id.* at ¶ 53). Plaintiffs allege that "Lewis' actions were motivated, in part, by a desire to appear hard on 'white parents'" and "by a hostility toward Dr. Hayes who had begun questioning the propriety of Lewis' actions and was vocally critical of Lewis." (*Id.* at ¶ 54). The State's Attorney filed Petitions for Adjudication alleging that Hayes and Namie abused their children. (*Id.* at ¶ 55). On November 16, 2017, a temporary custody hearing was held on the

Petitions for Adjudication, in which the state court, "relying almost exclusively on Dr. Narang's report," ordered that A.N. and M.N. should be removed from their parents' custody. (*Id*. at ¶¶ 60-61) (Dkt. 47 & 48).[1]

## Evidentiary Hearing

To prepare for the final custody hearing, Hayes and Namie retained Dr. Christopher Sullivan, a pediatric orthopedist at Comer Children's Hospital at the University of Chicago. (Dkt. 37 at ¶ 63). Dr. Sullivan reviewed A.N.'s medical records and ruled out abuse as a cause for the child's fractures. (*Id*. at ¶ 64). He concluded that A.N. had developed Rickets, a metabolic bone disease, as a result of the ECMO and Lasix treatment he received in September and October 2017. (*Id*.) Rickets causes a child's bones to weaken and thin so that they fracture even with routine handling. (*Id*.) Hayes and Namie shared Dr. Sullivan's report with Lewis, DCFS, Dr. Narang, and the Kane County State's Attorney on March 15, 2018. (*Id*. at ¶ 65). Despite Dr. Sullivan's contrary opinion, Dr. Narang did not change his initial opinion or consult with Dr. Keshwani or a qualified pediatric orthopedist as to Dr. Sullivan's conclusion. (*Id*. at ¶ 67).

On May 31, 2018, after an evidentiary hearing on A.N.'s condition, the Circuit Court issued an order giving weight to Dr. Sullivan's conclusions and dismissing the Petitions for Adjudication. (*Id*. at ¶ 68); (Dkt. 49 & 50). Dr. Narang testified at the hearing and maintained his initial opinion but admitted on cross examination that

---

[1] Although the state court's Temporary Custody Orders (Dkt. 47 & 48) and Adjudicatory Orders (Dkt. 49 & 50) are not attached to the FAC, the Court may nonetheless consider them in ruling on Defendants' motions to dismiss because the orders are referenced in the FAC and central to Plaintiffs' claims. *Mueller v. Apple Leisure Corp.,* 880 F.3d 890, 895 (7th Cir. 2018).

the likely time period for the origination of A.N.'s fractures was 10-14 days as opposed to 0-10 days. (Dkt. 37 at ¶¶ 69-70). After seven months of separation, Hayes and Namie were able to regain custody of their children. (*Id.* at ¶ 71).

**Present Action**

On March 30, 2019, Hayes and Namie initiated the present action claiming that Lewis, Dr. Narang, and Lurie Hospital deprived them and their children of their "constitutional rights to family association, including the right to parent one's children free from unreasonable government interference." (*Id.* at ¶¶ 79; 84). Additionally, Hayes and Namie bring claims of malicious prosecution against Lewis and Dr. Narang under state law.

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (internal quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). Dismissal for failure to state a claim is proper

"when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)).

## ANALYSIS

### I.   § 1983 Claims (Counts I- IV)

In Counts I through IV, Hayes, Namie, A.N., and M.N. each bring a claim under 42 U.S.C. § 1983, alleging that Defendants violated their substantive due process right to familial association. The Due Process Clause of the Fourteenth Amendment "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests," including "the interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (noting that the right to family association and integrity is "perhaps the oldest of the fundamental liberty interests recognized by this Court.") Children also have a fundament right "to be raised and nurtured by [their] parents." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). "'[T]he forced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.'" *Id.* at 1019 (quoting *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997)). But like any constitutional right, the right to family association and integrity is not absolute; it "is limited by the compelling governmental interest in the protection of children

8

particularly where the children need to be protected from their own parents and does not include the right to be free from child abuse investigations." *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003) (internal citations and quotations omitted). "In balancing these competing interests, courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F. 3d at 1019.

### A. Lewis

Plaintiffs allege that Lewis lacked "definite and articulable evidence" of abuse from her inadequate investigation of A.N.'s condition, such that separating the family through both the safety plan and the subsequent temporary custody hearing were unreasonable.[2] *Id.* Lewis argues that she had sufficient evidence of child abuse to justify her actions, but even if she lacked such evidence, she is entitled to qualified immunity.

The parties do not dispute that Plaintiffs have alleged a constitutional harm arising out of their separation from one another through the safety plan and subsequent temporary removal of A.N. and M.N. The parties dispute whether Lewis had "definite and articulable evidence giving rise to a reasonable suspicion" of child abuse to justify (1) the safety plan; or (2) seeking temporary protective custody.

---

[2] Lewis maintains that Plaintiffs improperly "argu[e] that their due process rights were violated by the child protection investigation itself," when there is no constitutional right to be free from child abuse investigations. (Dkt. 65 at 2). The Court disagrees. The FAC asserts Plaintiffs' constitutional harm from their forced separation not from the investigation. Plaintiffs challenge the sufficiency of Lewis' investigation to show that she lacked reasonable suspicion to conclude that A.N. and M.N. were abused.

*Brokaw*, 235 F. 3d at 1019. The Court considers each instance of separation in turn. The court will then address Lewis' claim to qualified immunity.

### 1. **Safety Plan**

Plaintiffs allege that even before investigating A.N.'s situation, Lewis presumed A.N. had been abused, evidenced by her alleged multiple false reports to the Geneva Police Department that medical staff believed A.N.'s injuries were indicative of abuse. (Dkt. 37 at ¶¶ 27-28). Further, when Lewis sent her colleague Corona to investigate A.N.'s situation, Lewis already intended to remove A.N. and M.N. from their parents relying on Dr. Narang's initial observations of A.N. on October 26, 2017. (*Id.* at ¶ 41). After her investigation, Corona recommended further investigation prior to removing the children, proposing a safety plan that would allow the family to remain together. (*Id.* at ¶ 43). Despite this, Lewis pressed forward with her plans to separate the family because she did not want to "tak[e] it easy on white parents," and implemented a safety plan requiring Hayes and Namie to leave their home and preventing them from having unsupervised contact with their children. (*Id.* at ¶¶ 43; 45). Construing these facts in the light most favorable to Plaintiffs, they are sufficient to allege that Lewis unreasonably separated the family through a safety plan based on a cursory investigation conducted with the assumption that child abuse had occurred.

Plaintiffs allege that instead of relying on articulable evidence giving rise to a reasonable suspicion of child abuse, Lewis was motived by racial animus. Lewis argues that her racial motivations are irrelevant because "'[t]he probable cause

analysis is an objective one[,]'" in which "'[t]he defendants' subjective beliefs are largely irrelevant ....'" (Dkt. 65 at 5-6) (quoting *Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 927 (7th Cir. 2011). Because Lewis had objective evidence of abuse in the form of Dr. Narang's October 26, 2017 examination of A.N., she contends that her subjective motive in separating the family based on race does not matter. At this early stage of the case, however, the Court cannot determine whether it was reasonable for Lewis to insist on a safety plan requiring separation and supervised visits relying on Dr. Narang's conclusions, particularly because Plaintiffs challenge the adequacy, independence, and accuracy of Dr. Narang's medical examination. It is unclear exactly what information, and in what detail, Dr. Narang conveyed to Lewis prior to the implementation of the safety plan. Indeed, Lewis' colleague, Corona, believed Dr. Narang's initial investigation was insufficient to justify a safety plan involving separation. (Dkt. 37 at ¶ 43). While the state court concluded that Dr. Narang's findings were sufficient to justify temporary removal of A.N. and M.N. from parental custody, Lewis instituted a safety plan requiring separation based only on Dr. Narang's *initial* observations of A.N. from October 26, 2017. (Dkt. 37 at ¶ 45-46). The report considered by the state court, by contrast, included Dr. Narang's findings from his additional testing of A.N. on October 27, 2017, which revealed several more fractures. (*Id.* at ¶ 46); (Dkt. 47 & 48). According to the allegations, Hayes and Namies' race was a fact Lewis considered in her decision to separate Hayes and Namie from their children and is thus relevant in considering the reasonableness of Lewis' actions. Construing the allegations regarding Lewis, including her alleged

racial animus, in the light most favorable to Plaintiffs, Plaintiffs have stated a cause of action against Lewis based on her initiating the safety plan.

Having concluded that Plaintiffs adequately allege a constitutional violation, the Court must consider Lewis' claim to qualified immunity. "Qualified immunity protects government officials from individual liability under Section 1983 for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Brokaw*, 235 F.3d at 1022. To overcome a qualified immunity defense, "plaintiffs must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was clearly established at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (internal quotations omitted). The question is "whether the state of the law at the time that [Lewis] acted gave [her] reasonable notice that [her] actions violated the Constitution." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). To make such a showing, "a plaintiff need not always identify a closely analogous case; rather, he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw*, 235 F.3d at 1022.

Such is the case at hand. No rational DCFS officer could believe that it is reasonable to make custodial decisions based on race. *See id.* ("[A] reasonable person would have known that it was unconstitutional to use the government's power to cause, or conspire to cause, the unjustified removal of a six-year-old child from his

parents in order to destroy the family, based simply on the family's religious beliefs.") Thus, at this stage, Plaintiffs have adequately alleged facts that overcome a defense of qualified immunity with respect to Lewis' decision to separate the family through a safety plan.

### 2. Temporary Custody Hearing

Plaintiffs also allege that Lewis sought temporary protective custody without sufficient evidence of child abuse. By then Dr. Narang had completed his November 1, 2017 report and concluded that he could not rule out child abuse as a cause for A.N.'s injuries. Moreover, the state court concluded that probable cause[3] justified both the initiation of temporary removal proceedings and the temporary removal of A.N. and M.N. from their parents. (Dkt. 47 & 48). It is not this Court's role to question that determination by entertaining a § 1983 claim based on a contrary assertion.[4] Courts in this district have granted qualified immunity in similar instances where a state court has found probable cause justified protective custody. *See e.g, Goetz v. Mt. Sinai Hospital*, No. 91 C 5723, 1995 WL 107130,*8 (N.D.Ill. Mar. 8, 1995) (on summary judgment, granting individual DCFS workers qualified immunity where juvenile court judge made a determination that probable cause existed to remove

---

[3] Although the relevant constitutional standard is reasonable suspicion, because reasonable suspicion is a less demanding standard than probable cause, the state court's determination that probable cause existed would encompass reasonable suspicion as well. *See Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012) ("To qualify as a reasonable suspicion, caseworkers must have more than a hunch but less than probable cause.") (internal quotations omitted).

[4] Such a claim may well run into issues under the *Rooker-Feldman* doctrine which prevents lower federal courts from reviewing state court judgments. *Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002). "The doctrine applies not only to claims that were actually raised before the state court, but also to claims that are inextricably intertwined with state court determinations." *Johnson v. Collins*, 5 F. App'x 479, 484 (7th Cir. 2001).

child from plaintiff's custody); *Evans v. Torres*, No. 94 C 1078, 1999 WL 1010983, at *6 (N.D. Ill. Sept. 30, 1999) ("The fact that a court issued an *ex parte* order granting DCFS custody of the [ ] children also suggest that [defendant]'s actions were reasonable and that qualified immunity is appropriate here.") Thus, Plaintiffs do not adequately allege that Lewis lacked reasonable suspicion of child abuse to initiate custody proceedings, and Lewis is entitled to qualified immunity. Counts I-IV are dismissed with prejudice as they pertain to Lewis' decision to pursue temporary protective custody of A.N. and M.N.

### B. Dr. Narang and Lurie Hospital

Plaintiffs allege that Dr. Narang ignored and failed to investigate A.N.'s prior medical history and instead, intentionally mischaracterized A.N.'s condition as potentially indicative of child abuse to shield Lurie and its staff from liability for causing A.N.'s fractures. Because DCFS and the state court relied on this conclusion in removing A.N. and M.N. from Hayes' and Namie's custody, Plaintiffs claim that Dr. Narang's actions deprived them of their constitutional right to family association.

Lurie and Dr. Narang argue that they are not state actors for purposes of § 1983. Plaintiffs assert that there is such "a close nexus" between the state actor's conduct (Lewis) and Lurie's conduct that the seemingly private behavior may be treated as state action. Dr. Narang also argues that his actions are shielded by absolute immunity. Plaintiffs assert that Narang's conduct fell outside what Plaintiffs call "witness immunity". (Dkt. 57 at 10).

14

### 1. State Actors

To hold a party liable under § 1983, the alleged constitutional violation must have been made "under color of state law." *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). Private action may be treated as state action if "there is such a close nexus between the state and the challenged action that such action may be fairly treated as that of the state itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (internal quotations omitted). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original).

Plaintiffs argue that Lurie and Dr. Narang are state actors by reason of their role in investigating child abuse and reporting it to DCFS. They claim that "Lurie maintained a Division of Child Abuse Pediatrics, specifically for the purpose of investigating child abuse," (Dkt. 57 at 10) and hired Dr. Narang "to investigate suspected incidents of child abuse." (Dkt. 37 at ¶74). Dr. Narang "is expected to work with law enforcement agencies and DCFS to remove children from their parents' custody in incidents of child abuse," so that his "involvement with A.N. was that of an investigator, not a treating doctor." (*Id.* at ¶¶ 74; 76). Putting aside the fact that Plaintiffs' complaint does not allege that Lurie's Division of Child Abuse Pediatrics is maintained for the purpose of investigating child abuse, Lurie and Dr. Narang are required by law to report child abuse to DCFS, "and individuals do not become state actors merely by acting in accordance with state statutes." *Evans v. Torres*, No. 94 C

1078, 1996 WL 5319, at *5 (N.D. Ill. Jan. 4, 1996) (citing 325 Ill. Comp. Stat. 5/4 (requiring physicians "to immediately report to [DCFS] when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused child or a neglected child.")); *see also Dickman v. Rosado*, No. 16 C 9448, 2019 WL 3728698, at *2 (N.D. Ill. Aug. 1, 2019) (allegation that defendant doctors "work[ed] as child abuse specialists … on the Protective Services Team at L[urie]" and "reported [their] findings and then ma[de] recommendations to the Illinois Department of Child and Family Services" was insufficient to allege state action because doctors must report child abuse to the state).

Similarly, Plaintiffs claim that "Lurie is paid for Dr. Narang's services, in whole or part, through funds received under contract with the Chicago Children's Advocacy Center ("CAC") … an organization that coordinates front-line responders in Chicago for reports of child abuse." (*Id.* at ¶ 75). First, as Defendants argue, Plaintiffs do not allege that the CAC is a state entity. But even assuming it is, courts in this district have concluded that similar contractual agreements are insufficient to transform private action into state action. *See Evans*, 1996 WL 5319, at *7 (physician and a hospital were not state actors even when they contracted with the state to investigate and report alleged child abuse and received compensation in return); *C.H. v. Grossman*, No. 14 C 8174, 2015 WL 4554774, at *2 (N.D. Ill. July 28, 2015) (allegation that DCFS gave money to hospital to support its participation in state-run program and the hospital in turn paid physician's salary with some of that money was insufficient to allege state action on part of hospital or physician). As the *Evans*

court articulated, "[a]lthough a contract concerning the statutory requirement exists, the duty to report derives from state law and not from a wholly voluntary joint undertaking between [physician], [hospital], and DCFS," such that a child abuse investigation conducted by medical professionals could fairly be attributed to the state. 1996 WL 5319, at *7.

Fundamentally, the nexus between Dr. Narang's medical diagnosis and Lewis' investigation is insufficient to support a finding of state action. Plaintiffs do not allege that Dr. Narang's observations and diagnoses of A.N.'s medical condition were initiated at the direction of or under the control of DCFS. Rather, the FAC suggests that Dr. Narang did not speak with Lewis regarding A.N.'s situation until *after* he conducted an initial observation of A.N. and suspected abuse. Even after Dr. Narang reported the suspected abuse, there is no allegation that Lewis attempted to influence or direct Dr. Narang's examination of A.N. in any way. Plaintiffs do allege that Lewis asked Dr. Narang to speak with them on October 26, 2017 after his initial observation of A.N., (Dkt. 37 at ¶ 39), but they do not allege how this interview played a role in Dr. Narang's medical examination, diagnosis, or report, on which they base their § 1983 claims. Similarly, although Dr. Narang wrote his final report "with knowledge it would be used by DCFS," there is nothing to suggest that the medical examinations about which he reported were influenced or controlled by DCFS. (*Id.* at ¶ 58). Where "[t]he state does not encourage or interfere with the actual examination" and the challenged conclusion that abuse could not be ruled out "involved a medical judgment made 'by a private physician according to professional standards that are not

established by the state,'" there is no state action. *Evans*, 1996 WL 5319, at *6 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982).

The Court is aware, as Plaintiffs argue, that some courts have reached an alternative conclusion. *See Goetz v. Mt. Sinai Hosp. Corp.*, No. 91 C 5723, 1992 WL 162975, at *8 (N.D. Ill. July 7, 1992) (contract between hospital and DCFS under which hospital received compensation to investigate and report child abuse was sufficient to allege state action) and *Mohil v. Glick*, 842 F. Supp. 2d 1072, 1077 (N.D. Ill. 2012) (physician and hospital were state actors because the expertise of medical professionals is "vital to, and an integral part of, the governmental act" of making child custody determinations). *Goetz* and *Mohil*, however, have not been cited by other courts in this district for these propositions. Rather, courts in the district have followed the rationale set out in *Evans v. Torres*, 1996 WL 5319, at *5-*8, which as mentioned above, held that medical professionals who report child abuse, whether or not that duty is also embodied in a contractual arrangement, are not state actors where DCFS does not control or direct their medical examinations. *See Dickman*, 2019 WL 3728698, at *2 (citing *Evans* in support of conclusion that doctors who worked as child abuse specialists on hospital team that reported findings of child abuse to DCFS and made recommendations to DCFS were not state actors); *Rangel v. Reynolds*, 607 F. Supp. 2d 911, 926 (N.D. Ind. 2009) (citing *Evans* in support of conclusion that doctor and nurse whose child abuse diagnosis was used by state to support child's removal from parental custody were not state actors); *Turner v. Chicago Police Dep't*, No. 98 C 0122, 1998 WL 483508, at *2; fn.1 (N.D. Ill. Aug. 10,

1998) (citing *Evans* in support of conclusion that doctors who reported sexual abuse to police were not state actors); *see also Grossman,* 2015 WL 4554774, at *2 (not citing *Evans*, but reaching same conclusion regarding contractual arrangement between hospital and state). Following the example of *Evans* and like cases, the Court concludes that Lurie and Dr. Narang are not state actors.

### 2. Absolute immunity

Absolute immunity "confers complete immunity from suit, not just a mere defense to liability and is applicable in suits under section 1983 because the legislative record gave no clear indication that Congress meant to abolish wholesale all common-law immunities." *Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005) (internal quotations omitted). Absolute immunity applies to judges for their judicial or adjudicatory acts, *Forrester v. White*, 484 U.S. 219, 225-29 (1988), witnesses, *Briscoe v. LaHue*, 663 F.2d 713, 718 (7th Cir. 1981), and the "quasi-judicial conduct" of "non-judicial officials whose official duties have an integral relationship with the judicial process." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986). For example, "social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court." *Millspaugh v. Cty. Dep't of Pub. Welfare of Wabash Cty.*, 937 F.2d 1172, 1176 (7th Cir. 1991). The rationale behind the doctrine is to protect the independence of these individuals and ensure their actions are "free of the harassment and intimidation associated with litigation." *Richman v. Sheahan*, 270 F.3d 430, 435 (7th Cir. 2001) (internal quotations omitted).

While Plaintiffs agree that Dr. Narang's state court testimony is protected by absolute immunity,[5] they argue that his inadequate examination of A.N.'s condition and his conclusion that child abuse could not be ruled out as a cause, are not immune from suit. (Dkt. 57 at 10-11). Courts in this district and others, however, have concluded otherwise. In *Mohil v. Glick*, for example, the court concluded that although a doctor did not testify in person at a custody hearing, her actions related to the creation of a report used at the hearing were absolutely immune from suit under § 1983. 842 F. Supp. 2d at 1079 ("[T]he policy considerations underlying witness immunity for testimony in open court appl[ied] with equal force to other forms of testimony such as depositions and affidavits.") (internal quotations omitted). Similarly, in *Vanwinkle v. Nichols*, the court found that a doctor who investigated child abuse and compiled her findings in a report was immune "for her actions related to the report, which later was one of the subjects of the administrative and judicial processes." *Vanwinkle v. Nichols*, No. 115CV01082JMSMJD, 2015 WL 9275671, at *9 (S.D. Ind. Dec. 18, 2015). *See also Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (psychologist and psychiatrists who examined a child and whose findings were used by the Department of Social Services to determine whether removal of children from family was appropriate were entitled to absolute immunity because the "function of providing information is analogous to that of a witness."); *Evans on behalf*

---

[5] Plaintiffs seem to concede that Dr. Narang's testimony at the custody hearing is subject to absolute immunity and cannot form the basis for their § 1983 claims. (*See* Dkt. 57 at 11). Yet in the FAC, Plaintiffs fault Dr. Narang for maintaining his original opinions at the hearing and refusing to reconsider them. (*See* Dkt. 37 at ¶¶ 70-71). To the extent Plaintiffs' § 1983 claims against Dr. Narang are based on his hearing testimony, such testimony is absolutely immune from suit.

of *Evans v. Unknown Agents of Dep't of Children & Families*, No. 06-61100-CIV, 2006 WL 8449860, at *4 (S.D. Fla. Oct. 31, 2006), *aff'd sub nom. Evans v. Unknown Agents of Dep't of Children & Families*, 278 F. App'x 935 (11th Cir. 2008) (doctors whose "medical reports [ ] formed the basis for the Petitions [for Removal] and the removal of the children from the family home" were entitled to absolute immunity).

Like the physicians in the above cases, Dr. Narang compiled his findings from his examinations of A.N. on October 26 and 27, 2017 into a report. DCFS relied upon Dr. Narang's report (1) to initiate removal proceedings, and (2) in court as a basis to argue for temporary protective custody over A.N. and M.N. Plaintiffs allege that the state court ordered the children's removal "[r]elying almost exclusively on Dr. Narang's report." (Dkt. 37 at ¶61). This Court agrees with the reasoning of the cases cited above. Although Dr. Narang did not testify at the temporary custody hearing, his report and the examination culminating in that report should be given the same protection as live testimony. The FAC further alleges that Dr. Narang wrote his report "with knowledge that it would be used by DCFS," (*Id.* at ¶ 58). But this only further supports the conclusion that Dr. Narang's examination of A.N. and his subsequent report fall within conduct protected by absolute immunity, conduct the court has called "other steps taken to present the case for decision by the court." *Millspaugh*, 937 F.2d at 1176. Consequently, Dr. Narang is entitled to absolute immunity for challenges to his examination of A.N., his report which embodied those findings, and his testimony at the custody hearing.

As Plaintiffs' § 1983 claims against Dr. Narang arise out the preparation of his report regarding A.N.'s injuries, Dr. Narang is entitled to absolute immunity. Because Plaintiffs' § 1983 claims against Lurie Hospital are predicated on the actions of Dr. Narang, those claims must likewise be dismissed.[6] *See Mohil*, 842 F. Supp. 2d at 1079 (N.D. Ill. 2012) (after finding the defendant doctor was absolutely immune, noting that "the Hospital—whose fate is inextricably linked to [the doctor's] for purposes of this case—is likewise absolutely insulated against Section 1983 liability.")

## II.    Malicious Prosecution (Counts V-VI)

In Counts V and VI, Hayes and Namie allege claims of malicious prosecution against Lewis and Dr. Narang under Illinois law. To state a claim for malicious prosecution, Plaintiffs "must allege facts showing: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (internal quotations omitted). As the Court has already observed, however, the state court specifically concluded that "[p]robable cause for the filing of the petition[s] [for adjudication] does exist." (Dkt. 47 at 3) (Dkt. 48 at 3). Plaintiffs thus fail to satisfy

---

[6] Plaintiffs' *Monell* claims against Lurie are based on Dr. Narang being a final policymaker of the Hospital. (*See* Dkt. 37 at ¶¶ 31; 79; 84; 89; 94). Lurie and Dr. Narang argue that Counts I through IV should be dismissed because (1) Plaintiffs have inadequately pled that Dr. Narang is a policymaker or (2) Lurie cannot be held liable under *respondeat superior*. Based on the Court's other rulings, the Court declines to consider these arguments.

the third element of malicious prosecution. *See Goetz*, 1995 WL 107130, at *8 (dismissing malicious prosecution claim under Illinois law in part because "[t]he juvenile court judge held that probable cause existed to believe that [child] had been abused.").[7] Counts V and VI are dismissed as to all Defendants.

## CONCLUSION

For the foregoing reasons, Defendants Narang and Lurie's motion to dismiss is granted as to all counts. They are dismissed from this case with prejudice. Defendant Lewis' motion to dismiss is denied in part and granted in part. Counts I-IV against Lewis are dismissed as to allegations and damages arising from the temporary protective custody hearing and sustained on the remaining allegations. Counts V and VI against Lewis are dismissed entirely.

E N T E R :

Dated: August 18, 2020

_____
MARY M. ROWLAND
United States District Judge

---

[7] The Court declines to consider Defendants' alternative arguments regarding Counts V and VI.